Good morning, Your Honors. Please look forward. My name is Timothy Burke, and I represent Linda Ward, Don Dovey, Brian Lewis, Kevin Yorman, in a case in San Mateo where they are alleging direct causes of action against At Home's majority controlling shareholders and the directors of At Home. There has been some question on the standard of review, and I'd like to address that, and also I'd like to address our individual causes of action, the dilution of the voting power of the minority, the majority versus minority claims. And first off is — Mr. Burke, why isn't it the case that each one of your claims, whether it's characterized as voting dilution or sale of the control block or false and misleading disclosures, don't turn on the same thing, which would be that your clients were minority shareholders before the March 2000 transaction and after the transaction. They couldn't have exercised any influence over the vote to approve the transaction before, and they couldn't after. And so any harm necessarily is not individual harm direct to them, but rather, well, there's just no harm. And whether you characterize it as no claim or whether you characterize it as necessarily being derivative, why isn't it true that it goes nowhere? There's a number of reasons, Your Honor. The first reason is that directors and majority shareholders owe fiduciary duties to minority shareholders. It is true that the plaintiffs, the San Mateo plaintiffs, can't be suing for a loss of control. They didn't have control. But that doesn't mean that the majority shareholders didn't violate their fiduciary duties. That's the whole purpose of the law of fiduciary duties is to protect the minority shareholders. If the minority had an ability to influence the transaction at all, then they wouldn't have to go to court because they were mistreated. They could have just voted against the transaction. That's the entire reason we're here. That's the entire reason why Delaware gives shareholders fiduciary duties. An individual shareholder is owed fiduciary duties of loyalty, fair dealings, and honest disclosure by directors. That's why. But the issue here is whether there's been anything that happened which gives the minority shareholders that you represent a direct action as contrasted with a derivative action. I mean, so that triggers sort of a different set of questions, doesn't it? Because the majority shareholders can, of course, breach a duty, but the duty may run and damages might have accrued to the corporation and not independently to the minority, apart from the corporation. Well, Delaware law currently states that when a – you have to look – the courts do not look at who's been harmed in the transaction and who would get the recovery. For the claim that the San Mateo plaintiffs, that their votes were diluted when AT&T traded 50 million Class A shares to 50 million Class B shares, which had 10 times as many votes, that claim doesn't have any effect on the company whatsoever. That's a pure, direct cause of action. What is the harm to them? Pardon me, Your Honor? What is the harm in that dilution? The harm in the dilution is that the share – the public shareholders had even less control than they ever had before. So you have less control, you have no control, and then you have less – and you still have no control. So what difference does it make? Well, it's AT&T entrenching itself in the corporation, Your Honor. Well, I just don't get it. That's the harm. Are you making a claim also that they should have gotten some premium that the other – that the group that acted with AT&T got? Is that part of your claim or not? Yes, Your Honor. They should have got the exact same thing that the group that acted with AT&T. That seems to me a very different claim from the dilution. Well, that's how they were treated unfairly. That's also a direct claim because the premium – the premium that was given to Cox and Comcast had nothing – again, had nothing to do with the corporation. It had no effect on the corporation. It was a deal between Cox, Comcast, and AT&T as part of this overall transaction. You don't cite much more on that point. In fact, you barely make it. That's true, Your Honor. It's a very difficult kind of case. It's a case where there should be rescission and there's commonly – Do you have any law showing that is an injury to the minority? I don't have any law showing that that's an injury to the minority, but it's just simply not an injury to the corporation. All right, but it's an injury to your clients. Correct, Your Honor. Is it? What's the basis for making that claim? The basis is that certain shareholders in this change of control – in this transaction, certain shareholders were given – were treated differently than other shareholders. If this was a case where every shareholder was treated the same, then we probably wouldn't have a cause of action at all. But this is a case where the groups of shareholders treated themselves differently. AT&T got certain things. Cox and Comcast got certain things. Are Class B shareholders supposed to be treated exactly the same as Class A? Except for their voting power, yes. The financial basis for the claims was the same, that they each had the same monetary value. All it was was a change in votes, and that's all. You know, the problem that I have with the issue of dilution or change of control is that if the minority shareholders had no say in the vote, no say in the control before the transaction, then it's hard for me to see what damage – how they're damaged. If A, B, and C collectively have total control and the minority shareholders don't have any control, then why does it matter if things get shifted among A, B, and C? Because the directors of a corporation have a fiduciary duty to all the shareholders. That's exactly what I'm alleging here. They have a duty to all the shareholders, but the question is whether if they breach that duty there's a derivative claim or a direct claim. One of the things that would be a direct claim in my view is if there's a misleading prospectus and it induces individual shareholders to hold their stock and not sell. Now, is there a claim like that in the complaint? There's not a claim like that in the complaint. And we would – the Fritz decision hadn't come out yet, which allows California plaintiffs to allege claims like that. When we had the – when we had the – when we filed the prospective second amended complaint. So could – what's the law as to whether your clients should have been entitled to amend their complaint to assert that claim if it wasn't asserted? I believe we should be allowed to amend that claim to allege direct causes of action, any type of direct cause of action, including that one. We also allege that they were misleading disclosures. And under Delaware law, even the – Yeah, but what's the harm from that? Because it couldn't have affected – couldn't have done anything about it? I mean, the same thing would have happened if AT&T or the Corporation of Investments had been totally, absolutely, unquestionably candid. Right? So what difference does it make? Even under Delaware law, that is a misleading disclosure, the plaintiffs are entitled to at least nominal damages. There's over 300,000 shareholders who are not going to get anything in this – from the bankruptcy. And there's over 300 million shares. Over 150 million shares. And they, in turn, threw their interest in the corporation. Well, that's completely why they – that's exactly why. They won't get anything unless the bondholders are paid off completely. Correct. Which is, as a practical matter, what's the size of the debt that the bondholders seek to recover? The order of magnitude of it. It's hundreds of millions of dollars. So what's the likelihood that that litigation will yield recoveries in excess of the debt? I – Did the judge make any findings about that? Not yet, Your Honor. The bondholders got a large recovery against AT&T. So our case doesn't interfere with any case against AT – that they might have against AT&T from now. So those claims of interference don't exist anymore. But won't you interfere with the bondholders' suit against Cox and Comcast? Well, I don't think – the bondholders recently filed a suit against Cox and Comcast. The bankruptcy order came out in September of 2002. They've had over three years to litigate a case against Cox and Comcast. Whether or not there's interference, I believe that argument's waived with laches because they waited three years to bring their claim. And furthermore, there's simply no case law that states that interference is a reason to not allow direct cases to go forward, even the case of Lipton. On the facts of Lipton, all the Lipton court said was a direct case that reserves – a direct shareholder can settle their causes of action if they reserve derivative claims for people to bring them. That's all. That's all that happened in Lipton. The bankruptcy court enjoined you for one reason because of the bondholders suing AT&T. The other suit hadn't been brought. Wouldn't the bankruptcy court, if it got a chance, do the same thing here on Cox and Comcast's suit? Well, that supposes that they should lift the stay against AT&T concerning Cox and Comcast. For the court to say there'd be interference, there was no complaint filed at the time in front of the bankruptcy court where interference could be shown. There was no complaint against AT&T, and there was no complaint against Cox and Comcast by the bondholders. Such a complaint didn't exist. So I don't – it was just inconceivable how the court could find interference in those claims. I thought the court's language was somewhat imprecise as to whether the court was saying that there were some direct claims, but they interfered with the bondholders' suit, or whether the court was saying there aren't any direct claims. I think there was some confusion on that issue. It's our position that there were direct claims. The claims that shareholders had their stock diluted are direct claims. What the bankruptcy court did is they said there's no substantial damages that are different from anything else. That's not what the bankruptcy court should be doing. The bankruptcy court should be deciding whose property that is. If it's property that's derivative, if it's a claim that's derivative and it belongs to the estate, then the estate should bring it. If the claim is direct and it belongs to the shareholders, then the shareholders should bring that. Whether or not somewhere down the road the plaintiffs can't prove their damage claim, that's a completely different issue. That's exactly what the bankruptcy court is doing in this case. The bankruptcy court said you may have claims, but there's no substantial damages. Is there any authority that would support the principle that the bankruptcy court violates Federal law if it enjoins the prosecution of direct claims, stays the prosecution of direct claims? Yes, Your Honor. There's a Ninth Circuit case that we cited that states that a permanent injunction against bringing a creditor versus creditor claim is not allowed under the bankruptcy code. Now, here the court stayed the claims. Does that have the effect of a discharge? Is it permanent? Yes, Your Honor. What's the practical effect of it? The exact procedural posture was the court ordered that the cases be dismissed. He ordered the San Mateo plaintiffs to go to the San Mateo courthouse and dismiss their claims. And while the case was on appeal, we filed a motion, and the court said you don't have to dismiss your claims, but they're stayed. You can't take any action on them until all the appellate rights have been earned. What is the monetary value of your claim, your direct claim? That's a very good question, Your Honor. If nominal damages of $1 per share were allowed for just the misleading disclosure claim, then the claim has a value of over $150 million. Now, would the misleading disclosure, in your opinion, give every shareholder a right to nominal damages, or would it only give shareholders a right to damages if they had kept their stock and not, you know, they had delayed selling because of misleading statements? If they delay selling while the market's heading downward, I guess they have some loss from that. Yes, Your Honor. That, of course, you're here representing all the shareholders, so I don't know how you can, if you can deal with or how you deal with that question, which may relate to some shareholders having a right that others don't. We believe the shareholders' rights in this case were ripe when the March 2000 transaction went forward in March 2000. I'd like to reserve the rest of my time for that. Surely. Thank you. Good morning. May it please the Court. My name is Richard Slack from the law firm of Weill, Gottschall & Manges, and we represent the estate of At Home by virtue of the plan of liquidation in the bankruptcy of At Home. I'm going to take 17 minutes, and Mr. Hockett is going to take the last three minutes, so we're going to be splitting our time. Mr. Hockett represents AT&T. Where I'd like to start briefly is on the standard of review, which I think is important in this case. We think on abuse of discretion standards should be applied, and let me tell you why. This is not a case where the determination below was merely whether the automatic stay of the bankruptcy applied to certain claims, but rather the automatic stay had already been in place, and the order putting in place the automatic stay with respect to this plaintiff was not appealed. And if you look at the record below, let me explain that. The two complaints that were filed by the appellants in this case were filed before the At Home bankruptcy. They originally filed complaints making derivative claims, right? They originally filed complaints that alleged derivative claims on the exact same transactions. In other words, the March 2000, both the original complaints and the proposed amended complaint both addressed the exact same transaction. I understand that. So then, but then when the Court said you can file a proposed amended complaint and they're, I assume, trying to state direct claims or should be trying to state direct claims, why wouldn't that be a legal question? Why isn't whether they stated a direct claim a legal question that we review de novo as opposed to abuse of discretion? Well, I think the legal standard, even under an abuse of discretion standard, to the extent you believe that the legal standard that's been applied is wrong, that would be grounds to say that something ---- Error of laws and abuse of discretion. I think that's right. But there were factual findings that the bankruptcy court made. And the other thing is the bankruptcy court in this case had a very unique position because he had lived with this case for a year. He knew very well what the claims were because they were made in the bankruptcy and they were discussed in the bankruptcy process against Cox, Comcast, and AT&T. So the bankruptcy judge was in a unique position to be able to assess whether the claims that would be asserted as part of the bankruptcy process in marshaling the assets were direct or derivative, i.e. were assets of the estate, and whether the prosecution of those claims would, in fact, interfere. And so what we have are two factual rulings which cannot be disturbed unless they are clearly ---- Well, this whole interference ---- I'm sorry. I didn't mean to interrupt you. It's okay. This whole interference argument sounds kind of un-American. I mean, I really ---- I question it seriously, whether it's correct, whether it can be correct as a matter of Federal law that a bankruptcy court can enjoin a direct claim of somebody because it might interfere with a claimant in the bankruptcy proceeding. Well, and that's why I think the standard that you have here is important because what happened is that you have a complaint that's filed. The complaint on file in San Mateo has been declared as derivative. And there was a stay that was put in place on that action based on the complaint that was filed. And that, by the way, is an order that's not being appealed on. From that order is an August 12th order that's at entry 2518 in the record and listed in volume two of the excerpts of record on page 578. And the importance there is that has not been appealed. So the automatic stay has been applied correctly, not appealed to that action. Now the question is, should the plaintiff have the opportunity to amend that complaint? Now, amending complaints is always in the discretion, but this is even more so given that you have a bankruptcy judge that has lived through the bankruptcy and the deference that's given to a bankruptcy judge in an abusive discretion standard is exactly the type of deference you should give to the judge who's marshaling assets for an estate. Why isn't American hardware rather close? I'm sorry? Why isn't American hardware rather close on the issue of the stay? Well, in terms of which point, Your Honor? Well, in terms of enjoining a other propriety of enjoining, you know, a third-party creditor. The case that's cited by the plaintiffs I think arises in the aspect of whether you can stay an action in the first place. This is a question of whether they can be allowed to amend a complaint in that action. In other words, the action has been stayed and that was not appealed from. And they appealed that action. It's been stayed because it's asserting a derivative claim. That's right. It's proper. But if it can be amended to assert a direct claim, then why should it be stayed? The question, I think, is twofold. Number one is, at that point, when you already have an action which is stayed, that's why you have an abusive discretion, because the bankruptcy judge then, as in all cases, is allowed. I just guess I don't get it. Okay. If you've got a complaint, it's stayed, then you've got an amended complaint. Yes. Why isn't that what's at issue? I mean, we're past the original complaint. Well, I think it is. And the only point I'm trying to make, Your Honor, because you're exactly right, is that, number one, that amended complaint does state derivative claims, and, number two, that there were factual findings that can only be disturbed that the bankruptcy judge made on a clearly erroneous standard. And if you look at the factual findings that were made and you apply that standard, it's pretty clear that these claims are direct. The two factual findings that I point out, one of which I think Your Honor had correctly talked about, was that there was nothing that this minority shareholder group could do that could affect the vote. They were a minority before. They were a minority after. There was nothing they could do to affect the vote. They had no power. There are a number of cases that we cite, both pre-Tooley, we'll get to Tooley, and post-Tooley, that say that the mere fact that you're diluted, this is the Barron's case that we cite in our brief, and I'd also like to point out to the Court two post-Tooley cases, which also have the same idea that the fact that you're diluted does not mean you have an individual claim if, in fact, what happened here was you had a transaction where the company was the party. And just so the two cases that I'd like to point out to the Court are, number one, the case Gatz v. Poncel. In the Gatz case, is it 2004, Westlaw, 302-9868, Delaware Chancery, November 5th, 2004. And I'll just give a gum sheet to the clerk with those. That's fine. I'm happy to do that. Are those also unpublished? Well, in Delaware, all the Delaware Chancery, or I should say, as far as I know, all the Delaware Chancery cases are slip opinions. And under the Delaware Chancery rules, there's nothing wrong with citing those. In other words, they don't have the rule against citing slip opinions, since all their cases are slip opinions. Yeah, but, I mean, it's just its value is the power of the reasoning. Well, I think the practitioners who spend a lot of time in Delaware law, we mine the slip opinions that are done by the Delaware Chancery Court, I think, fairly regularly. And they provide the authority that we use down in Delaware. I have a question for you. I ask the same question to Mr. Burke, or at least the question relating to it. It would seem to me, traditionally at least, that it would be a direct claim if a minority shareholder said there was a misleading prospectus, and as a result of that, I tucked my shares away and I didn't sell them and I would have otherwise sold them, and meanwhile the market crashed while I held my shares. Why wouldn't the minority shareholders, and I guess there are 300,000 of them or so, why wouldn't they have claims if there were misleading statements made, material omissions in the prospectus relating to this shift of control, and they relied on them, husbanded or kept their stock as a result, and didn't sell it in a timely way? I don't know if those claims are presented in the complaint, but wouldn't those be direct claims if such claims were asserted? Those claims are not asserted, and I think the appellant pointed out those claims are not asserted. I think those claims might very well be direct claims. I would point out that I think the Fritz case requires there be some kind of privity, so it's not clear whether you'd be able to get a class action, but it's not this case. It's a different case, and I would point out the one comment that the appellant made here is that the shareholders were not going to receive anything if they are not allowed to prosecute these claims. There are shareholder actions outstanding against AT&T, Cox, and Comcast relating to the buying and selling of shares, securities fraud cases out in New York. The Lakin case is one. I think that was cited in one of the briefs. But the point being that we have not gone and tried to stay all claims against the shareholders. What we've done is taken the claims that relate to the March 2000 transaction, and I think the important part of that transaction, it was a transaction where At Home was on the one hand and the controlling shareholders, Cox, Comcast, and AT&T were on the other, and it was one intertwined transaction. And the sole issue there is did the corporation, which was a party to the transaction, get enough consideration for all the things that AT&T, Cox, and Comcast got, whether it's an increase in the number of shares that AT&T got, whether it was the right of Cox and Comcast to put their shares, whether it was the $3 billion in warrants that At Home gave as part of that transaction. The point is that if there was a harm to the March 2000 transaction, that harm was to the company as a party to that transaction. We talk about pollution. There's nothing wrong with a company issuing stock to a majority stockholder or anyone else as long as they're getting fair value for it and it doesn't affect the vote. And that was the point that was made here. There is no harm to the shareholders because the shareholders, the minority shareholders, could not affect this vote. The sole question in terms of all that transaction in the March 2000 transaction was whether the company was properly and adequately compensated by virtue of being a party and having AT&T, Cox, and Comcast getting what was really a bundle of goodies. Do you understand the plaintiffs making any claim that they should have received the premium for their shares that Cox and Comcast got? Well, I do think they're trying to make that claim. I don't think it's a claim that they can make for two reasons. Number one, putting aside this transaction for a second, if you're a controlling shareholder and you sell your controlling interest, in other words, if you have a minority group, so that you're not transferring control from the minority, you know, the public shareholders aren't in the majority and then becoming the minority. There's no transfer of control. And here there's no transfer of control in the sense that the minority stockholders were the minority before and the minority after. There's nothing that prevents majority stockholders from transferring their majority interest without paying the minority. But, and here's the big but, in the March 2000 transaction, at home was a necessary party. At home had to amend its charter. At home had to give Cox and Comcast certain contractual rights or they weren't going to sell their stock to AT&T. The point is, should at home have been compensated for facilitating that transaction? And if you look at the Thorpe case, which we cite in our briefs, the Thorpe case makes that point exactly, that there's nothing wrong with the majority selling their stock. But, if the company's a necessary party, the company needs to have a taste. The company needs to get compensated. It's not the individuals, it's a company claim. And that's really at the heart of what we're saying here. I'd like to take a second and deal with the disclosure claim which is being made. And I think there was some question of whether you could have a, whether if you had a disclosure claim, a disclosure claim has nominal damages. There's two points to that. Number one, here the question is harm. The public shareholders could not affect this vote. And so the disclosures to them were legally irrelevant. And that was what, as a factual matter, the judge below, the bankruptcy judge found. And number two, and this is also critical, you have to look at what the complaint says. They're trying to make this sound like this is a huge disclosure claim. The fact is, is there is one allegation in the amended complaint of something which they say was not disclosed to the shareholders. One out of 73. And in that claim, all they say is that Cox and Comcast didn't say to the public shareholders that they were going to leave at home as customers. They misled at home. Now, if Cox and Comcast were going to leave at home, at home was the entity that was going to be harmed. And there's a post Tooley case, again, which I think is the Delaware standard, which is, and I'll also leave this with the clerk, which is the J.P. Morgan case that was decided earlier this year. And in that case, you had the same situation. You had a disclosure and a proxy. The court found that you have to look at the underlying claim. If the underlying claim would have given rise to a company suit, then the disclosure claim can't bootstrap something different. In other words, that's the same thing here. If Cox and Comcast lied about leaving at home, it was at home that was going to suffer the harm. And at home is the one that should get the benefit. That's the company. I have reserved a few minutes for Mr. Hockett. Okay. Mr. Hockett. May it please the Court. My name is Christopher Hockett, and I represent AT&T Corp. First, I'd like to – I only have a couple of points. First, I'd like to indicate AT&T's agreement with the bondholder's argument with regard to the direct versus derivative issue, and we adopt that argument as our own. Second, I would like to say that if the Court disagrees and were to allow the San Mateo plaintiff's action to be restarted, even as against AT&T only, the harm identified or the risks identified by the bankruptcy court and the district court below would still obtain. That's because the very same factual and legal issues lie at the heart or would lie at the heart of the San Mateo State Court litigation and the litigation that the bondholders have now instituted against Cox and Comcast. And indeed, it might be the case that Cox and Comcast would need to be added in to the State court litigation in order for either indispensable parties or cross-complaint defendants in order to adequately address the San Mateo plaintiff's claims. Judge Noonan, you asked whether the San Mateo plaintiffs were attempting to assert a claim for the change of control premium, and I would point the Court to paragraph 63, among many others, of the proposed second amended complaint. Which accuses the defendants, including AT&T, Cox and Comcast, of breach of fiduciary duty for failing to take all steps necessary to ensure that at-home shareholders would receive the maximum value realizable for their shares in any change of control involving the company. So the situation that we have is in the San Mateo case were it allowed to proceed, that is, if the direct versus derivative argument were not to carry the day, you'd have a claim against AT&T that it essentially paid a change of control premium to the wrong parties, to Cox and Comcast, when it should have been paid to the shareholders. If that is the issue, then Cox and Comcast may need to be there because they were the ones who received the premium. The San Mateo plaintiffs acknowledge the interrelationship of their claims and the bondholders' claims in their brief by arguing that all of the claims ought to be coordinated in the same proceeding under California Code of Civil Procedure 404.1, which allows consolidation in circumstances in which there are predominating and significant questions of fact or law common to both sets of claims. So I think that's an admission that there is a strong relationship between these two lawsuits. With regard to your question, Judge Gould, about whether there's authority for enjoining prosecution of actions which may interfere with actions that are under the control of the bankruptcy court, we cited a couple of those cases in our brief, in AT&T's case, and in the case of Lazarus, Johns Manville, and American Film, all of which stand for the proposition that a bankruptcy court may properly enjoin actions by or against non-debtors if they would interfere with the administration of the estate. Unless the Court has anything further, I'll sit down. Okay. Thank you. Counsel, Mr. Burke. Thank you, Your Honor. To respond, it's not really true that the plaintiffs couldn't take any action whatsoever. Plaintiffs could have went if they had complete, full, honest disclosures. They could have went to a court of equity and enjoined this transaction. And that's another reason why they were harmed. Even though they didn't have the voting control to effectively block the transaction, there was things that they could do. Furthermore, concerning the cases where courts had stayed, creditor versus creditor actions, those cases were all Chapter 11 reorganization cases. There's not a single one that's a liquidation case like this case. And when plaintiffs first filed their case in San Mateo County, it contained both direct and derivative causes of action. We've never said that our complaint didn't have derivative causes of action originally. We've just said that it had direct also. And what we did in front of the bankruptcy court was try to remove all the derivative causes of action and allege direct causes of action. And it seems what's going on is that the court below found that there were direct causes of action but said there's no substantial damages or the damages are so very intertwined. Once the court found that those were direct causes of action, we should have brought those causes of action. Because what you have now, if this case is permanently stayed, my client's case is permanently stayed, you're going to have the bondholders getting a full recovery, but the people who lost the most, the minority shareholders, getting absolutely nothing in this case. Thank you. All right. Counsel, thank you for your argument. The matter just argued will be submitted.
judges: Noonan, Rymer, Gould